ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO

MAY 1 3 2016

JEFFREY P. COLWELL
CLERK

Civil Action No. 15-cv-00823-MJW

Tyrone Walker, Plaintiff,

v.

David Scherbarth, in his individual and official capacities,

Wesley Wilson, in his individual and official capacities,

Frankie Nickels, in his individual and official capacities,

Virginia Page, in her individual and official capacities,

Felicia Brooks, in her individual and official capacities,

Jean Peterson, in her individual and official capacities,

Ramona Phipps, in her individual and official capacities,

Brian Uhrich, in his individual and official capacities,

Allen Harms, in his individual and official capacities,

Curtis Deines, in his individual and official capacities,

Diana Hillyer, in her individual and official capacities,

Lisa Fitzgerald, in his individual and official capacities,

Raymond Higgins, in his individual and official capacities,

Kevin Vorwald, in his individual and official capacities,

Marc Bolt, in his individual and official capacities,

Defendants.

PLAINTIFF'S RESPONSE TO DEFENDANTS' SUMMARY JUDGMENT

Comes now, Plaintiff, Tyrone Walker, appearing pro se in the above captioned case, respectfully submits Response to Defendants' Motion For Summary Judgment.

UNDISPUTED/DISPUTED FACTS

In pages 4-7 of their motion for Summary Judgment, Defendants set out 16 facts they allege to be undisputed. Plaintiff concedes that Undisputed Facts 1,3,5, and 7-16 are, in fact, undisputed.

However, Undisputed Facts 2,4, and 6, although not exactly incorrect, may be mis-leading if left unclarified. As to Undisputed Fact 2, the fact itself, is NOT being disputed. However, Exhibit 2, which Defendants point to as ~~Undispu~~ supporting Undisputed Fact 2, says absolutely NOTHING about Plaintiff being an Offender Care Aide (O.C.A.) while at Limon Correctional Facility (LCF), as Defendants have stated.

Undisputed Fact 4 is not being disputed, however, it must be understood that Plaintiff was not told about R.P. being a consequence until 9/5/13.

As to Undisputed Fact 6, Defendants assert that Administrative Regulation (A.R.) 600-05 provides for the placement of prisoners on R.P. who refuse to accept "a" Job assignment. Although this application of A.R. 600-05 is appropriate in circumstances where a prisoner is not assigned, it is not the appropriate application of the A.R. to the instant case since Plaintiff was actually assigned to a facility Job.

In instances where a prisoner is ~~are~~ already assigned, A.R. 600-05 only provides for the placement of prisoners on R.P. "who refuses to participate in, or is terminated from," their assigned Job. Plaintiff will elaborate on this distinction below.

ARGUMENT : STANDARD FOR SUMMARY JUDGMENT

(2)

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

In seeking summary judgment, the "moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.ct. 2548, 91 L.Ed.2d 265 (1986). 'Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter.' Concrete Works [Inc. v. City & County of Denver], 36 F.3d [1513], 1518 [(10th Cir. 1994)] (citing Celotex, 477 U.S. at 325). The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate 'specific facts showing that there is a genuine issue for trial.' Celotex, 477 U.S. at 324; see Fed.R.Civ.P. 56(e)(2006). A fact in dispute is 'material' if it might affect the outcome of the suit under the governing law; the dispute is 'genuine' if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. Allen v. Muskogee, 119 F.3d 837, 839 (10th Cir. 1997)(citing Anderson [v. Liberty Lobby Inc.], 477 U.S. [242,] 248 [(1986)]). The court may consider only admissible evidence when ruling on a summary judgment motion. See World of Sleep Inc. v. Lay-Z-Boy Chair Co., 756 F.2d 1467, 1474 (10th Cir. 1985)." Freeman v. White, 2006 U.S. Dist. LEXIS 70315, 29-30.

"In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998)(citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L.Ed.2d 538, 106 S.ct. 1348 (1986)." Starnes v. Gillespie, 2004 U.S. Dist. LEXIS 8064, 11-12.

## I. Exhaustion of Available Remedies

Defendants' first contention, is that Plaintiff failed to exhaust the grievance process on

the alleged retaliation claims, and therefore, has failed to comply with the exhaustion requirement of 42 U.S.C. 1997e prior to bringing the instant civil action.

It is Plaintiff's contention, however, that he has exhausted the remedy available to him, and therefore, did comply with the exhaustion requirement of 42 U.S.C. § 1997e. As so, Plaintiff provides the following.

42 U.S.C. § 1997e(a) states that " no action shall be brought with respect to prison conditions under Section 1983 of this title, or any other Federal law, by a prisoner in any Jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Booth v. Churner, 532 U.S. 731, 736, 121 S.Ct. 1819, 1822 (2001).

The U.S. Supreme Court explains that "to properly exhaust administrative remedies prisoners must 'complete the administrative review process' in accordance with the applicable procedural rules,' [ Woodford v. Ngo, 548 U.S. 81, 88, 126 S.ch 2378, 165 L.Ed.2d 368, 377 (2006)]-- rules that are not defined by the PLRA, but by the prison grievance process itself. Compliance with the prison grievance procedures, therefore, is all that is required by the ~~PLA~~ PLRA to 'properly exhaust'." Jones v. Bock, 549 U.S. 199, 218, 127 S.Ct. 910, 923 (2007).

As the above referenced case law explains, proper exhaustion under 42 U.S.C. § 1997e is not based on whether or not Plaintiff filed and exhausted the grievance process offered by the Colorado Department of Corrections; but is, instead, based on whether or not Plaintiff exhausted the remedies available to him.

In the matter at issue, the first act of retaliation complained of, was committed by SCF's Classification Committee. Pursuant to CDOC policy, CDOC policy being the A.R.s, decisions of the Classification Committee are not grievable matters.

See Exhibit 10, Attachment 1, p. 4, Section D.2.b (A.R. 850-04, IV.D.2.B)(This grievance procedure **may not** be used to seek review of the following: b. Classification is entirely at the discretion of the administrative head and classification committee of each facility.).

The reason CDOC policy does not permit prisoners to grieve decisions of the Classification Committee, specifically with regard to prisoners' placement on R.P., is because CDOC policy provides an appeal process for the matter. See Exhibit 6, pp. 2-3, Section IV.A.5.d (A.R. 600-05, IV.A.5.d)(When an offender is placed on R.P. status by the facility classification committee, the offender has 15 working days to appeal the decision.).

Therefore, the appeal offered by A.R. 600-05 was the only remedy available to Plaintiff with regard to the first act of retaliation committed by the Classification Committee. The grievance process was not just unavailable to Plaintiff, it was also prohibited by CDOC policy.

The appeal process being the only remedy available to the Plaintiff, he made sure to file it in accordance with applicable rules and regulations, and made sure to explain that the act of placing him on R.P. was done in retaliation of his decision to pursue his right of access. See Exhibit 12, 2nd page (Restricted Privileges Status Appeal Form)(I was placed on R.P. because I chose to pursue my right of access to the court.).

Further proof that decisions of the Classification Committee are not grievable, are the grievances Plaintiff attempted to file while on R.P. The Defense has included eight of these grievances as as Attachments 2, 3, and 4 of Exhibit 10. Respondents to seven of the eight denied grievances, cited A.R. 850-04, IV.D.2.b, as their reason for denying those grievances. Providing that decisions of the Classification Committee are not grievable matters. See Exhibit 10, Attachment 2, 3, and 4.

Once again, A.R. 850-04, IV.D.2.b, states that "This grievance procedure **may not** be used to seek review of any of the following: Classification is entirely at the discretion of the administrative head and classification committee of each facility."

Lastly, on 12/30/13, Plaintiff met with Defendants Nickels and Harms to discuss the retaliation being committed by the Classification Committee and the inadequacies with the appeal process. In regard to the retaliation, Defendant Harms noted that "He feels that

this action is retaliation against him." Exhibit 5, p. 9, entry date 12/30/13.

In regard to the inadequacies with the appeal process, Defendant Harms noted that "In his complaint he states that there are issues that can not be grieved. He feels he is being denied a right." Exhibit 5, p. 9, entry date 12/30/13.

To be more specific, Plaintiff complained about the fact that the appeal process is a one-and-done process. That once he had submitted the appeal — within 15 working days — he could not appeal anything else that occured as a result of being on R.P. Not even the R.P. Review Board's decision to retaliate against him again and again, by re-committing him to R.P. each time he explained that he would not abandon his right of access in favor of being released from R.P.

Simply put, CDOC's grievance process was not a remedy available to the Plaintiff.... And for that reason, Plaintiff did not attempt to air his complaints about the retaliations through the grievance process. The appeal process was, however, an available remedy. And as so, Plaintiff exhausted the appeal process according to applicable CDOC policy.

With respect to the numerous acts of retaliation the followed the original retaliation, Defendant Harms' type-written notations of his meeting with Plaintiff on 12/30/13, demonstrated that Plaintiff attempted to find an administrative remedy that would allow him to air his complaints of retaliation, but there was none available to him.

And finally, the eight grievances Defendants included as Attachments 2, 3, and 4 of Exhibit 10, demonstrates that all grievances filed about any aspect of R.P. was refused and/or denied, because R.P. is governed by classification, and classification is not a matter which can be grieved

Wherefore, Plaintiff did exhaust the one remedy available to him with regard to the allegations of retaliation. Therefore, Plaintiff has complied with the exhaustion requirement of 42 U.S.C. § 1997e.

II. Plaintiff Can Demonstrate A Genuine Question Of Material Fact.

As to the case at issue, all nine remaining claims, are claims of retaliation in violation of Plaintiff's First Amendment right of access to the court. "Access to the courts is a fundamental right protected by the Constitution, including the First Amendment right to petition the government for redress of grievances. Nordgren v. Milliken, 762 F2d 851, 853 (10th Cir. 1985) . . . . Simply stated, '[p]rison officials may not retaliate against or harass an inmate because of the inmate's exercise of his right of access to the courts.' Smith v. Maschner, 899 F.2d 940, 947 (10th Cir. 1990)." Faircloth v. Schwartz, 2014 U.S. Dist. LEXIS 126384, 19-20.

"In order to establish a First Amendment retaliation claim, a prisoner must demonstrate: (1) he was engaged in protected conduct; (2) that he suffered an adverse action; and (3) that a causal connection exists between the protected conduct and the adverse action." Faircloth v. Schwartz, 2014 U.S. Dist. LEXIS at 22

As to prongs one and two, Defendants admit that Plaintiff was engaged in the constitutionally protected act of accessing the court and that he suffered an adverse action. One that caused "plaintiff to suffer an injury sufficient to chill a person of ordinary firmness from continuing to engage in that activity". [Defendants Motion For Summary Judgment, p. 14].

See [Def.'s Motion For Summary Judgment, p. 15 ](As to the first and second prongs and for the purpose of this motion, Defendants concede that Walker's pursuit of grievances and a lawsuit about water contamination is constitutionally protected activity, but maintain that Defendants did not take actions intended to directly impact or induce this activity.).

Defendants' argument on this matter, rests solely on the third prong of the aforementioned three pronged standard. To establish the third prong, Plaintiff must provide "specific facts that, if credited, establishes that but for the defendant's improper retaliatory motive the incidents to which he refers, including the disciplinary action, would not have taken place." [Def.'s Mot. For Summary Judgment, p. 15 ](quoting Allen v.

Avance, 491 Fed. Appx. 1, 6 (10th Cir. 2012)). See also Faircloth v. Schwartz, supra (This principle applies even where the action taken in retaliation would be otherwise permissible.) (quoting Smith v. Maschner, 899 F.2d at 948).

In establishing a retaliation claim, the Tenth Circuit has made it absolutely clear that circumstantial evidence can create an issue of material fact barring summary judgment. " See Maschner, 899 F.2d at 949 (holding that the inmate sufficiently supported retaliation claim with " only means available to him — circumstantial evidence of the suspicious timing of his discipline, coincidental transfer of his witnesses and assistants" ). " Brackeam v. Brown, 2013 US Dist. LEXIS 11772, 24.

In argument " II " of Defendants' Motion For Summary Judgment, Defendants argue that " Walker was required to accept the facility directed job assignment", [Def.s Mot. For Summary Judgment, p. 15 ], of working in Food Services. And that because Plaintiff refused to accept the job assignment in Food Services, Defendants were justified and required by CDOC policy to place Plaintiff on R.P. ; R.P. being the adverse action taken against Plaintiff.

See [Def.s Mot. For Summary Judgment, p. 16 ] (Defendants' actions were based on legitimate statutory and policy requirements and not a result of any protected activity on the part of Walker.).

Plaintiff admits that he did not accept the job in Food Services.. However, Plaintiff disputes Defendants' assertion that he was required to work in Food Services. It is also Plaintiff's contention that Defendants actions were NOT based on legitimate statutory and and CDOC policy.

Plaintiff argues that because he was assigned as an O.C.A. at the time of the alleged incident, he was not required to accept the Food Service assignment. Plaintiff also contends that because he had a job as an O.C.A., he could not be subjected to the sanctions of AR. 600-05. This is because R.P. is not a sanction that can be imposed against a prisoner

who has a facility job.

A.R. 600-05, III.H, defines "Restricted Privileges (R.P.) Status [as]: A condition created by an offender who refuses to participate in assigned programs or is terminated for cause." Exhibit 6, p.2, § H. (underline added).

"Participate" is defined as "An offender who is active in labor, educational, treatment, or work program resulting in satisfactory or above program review (2.0 or above)." Exhibit 6, p.1 § C (A.R. 600-05, III.C)(underline added).

And A.R. 600-05, IV.A.1, provides that "Any DOC offender who refuses to participate in, or is terminated from, a DOC sanctioned work or treatment program is subject to Restricted Privileges Status". Exhibit 6, p.2, § IV.A.1.

Plaintiff maintains that he was an O.C.A. in August of 2013 and September of 2013 — that being the time when the alleged retaliation occured. During this time as an O.C.A., Plaintiff performed his duties as an O.C.A., and therefore, had not "refuse[d] to participate in, [nor was he] terminated from, [his] DOC sanctioned work", Exhibit 6, p.2, § IV.A.1.

The above cited A.R.'s are clear on the fact that for a prisoner to be approved for placement on R.P., he must have had "refuse[d] to participate in" HIS "assigned" job or program. Because Plaintiff was assigned to as an O.C.A. and not to Food Services, the act of not participating in Food Services — a job Plaintiff was not assigned to — could not be used as a predicate to subject him to R.P.

See Exhibit 16. The Sworn ~~Affidavit of Lewis M~~ Declaration of Lewis Moore, Doc# 47702. Mr. Moore is a disabled prisoner, who was, in late August and early September of 2013, Plaintiff's client during Plaintiff's time as an O.C.A.

The fact in dispute here, is whether CDOC policy required Defendants to place Plaintiff on R.P., or whether Defendants took that adverse action against Plaintiff irrespective of CDOC policy.

Defendants contend that Plaintiff's failure to accept the ~~Food~~ Food Services position justified

placing him on R.P. Plaintiff argues otherwise, and as so, has provided evidence, Exhibit 16, that shows that he was an O.C.A. Plaintiff has also demonstrated through Exhibit 6 (A2. 600-05), that CDOC policy does not provide for the placement of a prisoner on R.P., if that prisoner is actively participating in his assigned work and did not get terminated for cause.

The fact at dispute in this argument, and the reason it is being disputed, is relevant to the third prong — that being the but for requirement — of the three pronged standard. See [Def.'s Mot. For Summary Judgment, p. 15] (To satisfy the "but for" requirement, an inmate must show that there was no legitimate penological reason for the prison's actions.)(citation omitted).

Because Plaintiff was assigned and actively participating in his assigned job, CDOC policy did not provide for his placement on R.P. Therefore, "there was no legitimate penological reason for the prison's action", [Id.], of placing Plaintiff on R.P.

Plaintiff has established that the fact in dispute is a material fact that presents a genuine issue for trial. For this reason, Defendants are not entitled to Judgment as a matter law. Plaintiff requests that summary Judgment be denied.


III. Discovery Indicates That Defendants Have Doctored, Altered, And Falsified Evidence.

Next, in argument "A" of Defendants' Motion For Summary Judgment, Defendants argue that Plaintiff's CDOC record, does not support Plaintiff's assertion of being assigned as an O.C.A. More specifically, Defendants argue that Plaintiff's CDOC record is void of any indication that Plaintiff was assigned as an O.C.A. after his transfer to SCF on August 2, 2013.

Plaintiff argues that the only reason his CDOC record does not reflect the fact that he was assigned as an O.C.A., is because Defendants have erased any mention of Plaintiff's time as an O.C.A. during the time in question. Defendants have also doctored and falsified

documents they submitted to their counsel..., who, in turn, has furnished these doctored and falsified documents to Plaintiff during discovery.

By doctoring, erasing, and falsifying evidence, Defendants have contradicted key elements of their defense, and have done so in an obvious way.

To begin with, it is an undisputed fact that Plaintiff never accepted the Food Service position that was offered to him. Therefore, Plaintiff never worked a single day in Food Services. See Exhibit 5, p. 13, entry date 8/16/13 (offender refused to sign job description and stated that he would not work in the kitchen); Exhibit 5, p. 12, entry date 9/6/13 (Inmate Walker refused to sign job description for the second time); see also [Def.'s Mot. For Summary Judgment, pp. 5-6, ¶¶ 5, 7, 8, 10].

Defendants, despite their acknowledgment that Plaintiff never worked a single day in Food Services, created four documents that show not only that Plaintiff worked in Food Services, but that he was paid for the days he worked, and that his attitude and aptitude were good and acceptable. These four documents have been designated as Exhibits 17-20, and are titled "Department of Corrections Employment/Academic/Vocational Evaluation".

Exhibit 18 displays that Plaintiff worked from August 27, 2013, to August 31, 2013; that Plaintiff's pay rate was $0.82 a day; and, that Plaintiff's "Attitude Rating" was "2 GOOD" and "Aptitude Rating" was "2 ACCEPTABLE". See Exhibit 18.

According to other information turned over by Defendants, Plaintiff's days off would have been Tuesdays, Wednesdays, and Thursdays. See Exhibit 5, p. 13, entry date 8/16/13 (his days off would be TWT); See also [Def.'s Mot. For Summary Judgment, p. 15] (his Food Services assignment would have ended 10:30 each workday, with Tuesday, Wednesday, and Thursday off each week).

Despite having Tuesdays, Wednesdays, and Thursdays off, the falsified document, Exhibit 18, says that Plaintiff worked on Tuesday, August 28, 2013, on Wednesday, August 29, 2013, and Thursday, August 30, 2013.

This very same falsified document, Exhibit 18, provides that Plaintiff's Attitude Rating was a 2 and Aptitude Rating was a 2. This meant that Plaintiff's performance at work was satisfactory. And according to Exhibit 6, p. 1, § III.C (A.R. 600-05, III.C) a rating of 2 demonstrates that Plaintiff "participate[d]" in his work assignment, and therefore, was not subject to placement on R.P.

The falsified documents also provide that Plaintiff was paid $0.82 a day from 8/27/13 – 9/6/13, See Exhibit 18 and 19, and $0.28 a day when he was unassigned. See Exhibit 17 and 20.

It is impossible for Plaintiff to have been paid $0.82 a day as a Food Service Worker and $0.28 a day for being unassigned. Impossible, because in 2013, full time pay was ~~$0.23~~ $0.60 for Food Service workers, and unassigned pay was $0.23. That is $0.60 a day and $0.23 a day, respectively. See Exhibit 21, Attachment 1, p. 11, § J.1.a and c. (A.R. 850-03, IV.J.1.a and c).

The pay for Food Service workers and unassigned pay was raised to $0.82 and $0.28 a day, respectively, on July 1, 2015. Twenty three months after Plaintiff allegedly worked in Food Services. The document necessary to establish that Food Service and unassigned pay changed to $0.82 and $0.28 on July 1, 2015, is A.R. Form 850-03E, which is an attachment to the current version of A.R. 850-03.

The falsified documents, Exhibits 17-20, were not received by Plaintiff until April 8, 2016. This is well after the discovery deadline set by this Court. Because of this, Plaintiff was unable to obtain a copy of the current version of A.R. 850-03 during discovery. Having no other means of acquiring said A.R., Plaintiff is unable to attach it as an Exhibit to this Response.

Understanding that the Court is not required to consider evidence not cited or in the record, Plaintiff would like to remind the Court that Exhibit 21 establishes that in 2013, full time assigned pay was only ~~$.60~~ $0.60 a day and unassigned pay was only

$0.23 a day. And not $0.82 and $0.28 a day as Defendants have purported.

Exhibit 2 is another document that has been altered by Defendants. Exhibit 2 is an "Offender" "Query" list. It explains all the jobs Plaintiff has had while in CDOC. It is Plaintiff's contention that Defendants have erased any indication of his assignment as an O.C.A. during the time period at issue — August and September of 2013. In doing so, Defendants have unintentionally erased any indication of Plaintiff's time as an O.C.A. while he was at LCF the month prior to being transfered to SCF.

According to the "Affidavit of Tonya Whitney", "CDOC" "Inmate Bank Supervisor", Exhibit 3, pp, 1-2 : ¢. ¶ 1, Plaintiff received pay of "$12.40 on August 1, 2013, from his employer at Limon Correctional Facility for his work as an Offender Care Aide I," Exhibit 3, p.2, ¶ 4. This same exhibit explains that Plaintiff received "$0.80 on September 3, 2013", for his work as an O.C.A. while at LCF. See Exhibit 3, p.2, ¶ 6.

Exhibit 2, the Offender Query list, does not show that Plaintiff was an O.C.A. after transfering to SCF, as Defendants have correctly pointed out. However, this very same Offender Query list, does not show that Plaintiff was ever assigned as an O.C.A. while at LCF. This is so, despite the fact that Defendants have produced the sworn affidavit of the CDOC Inmate Bank Supervisor as evidence demonstrating that Plaintiff was assigned as an O.C.A. while at LCF in July of 2013, and that Plaintiff was paid for carrying out his duties as an O.C.A. in August and September of 2013.

Defendants now ask that this Court accept Exhibit 2 for purposes of establishing that Plaintiff had not worked as an O.C.A. while at SCF in August and September of 2013. Defendants make this request in spite of the fact that Exhibit 2 does not even reflect the fact that Plaintiff was assigned as an O.C.A. while at LCF — a fact that all parties have agreed to being undisputed.

Furthermore, the evidence which Defendants have produced in support of this

argument, may not — as a matter of law — even be admissible.

For the reasons stated in this Section III of this Response, Plaintiff asks that this Court not consider Exhibit 2 for the purpose of supporting Defendants' ~~argument~~ argument "A" or any other argument put forth by Defendants in their request for summary judgment.

Instead, Plaintiff asks that this Court consider Exhibit 2, along with the falsified documents, Exhibits 17-20, to determine whether Exhibit 2 is even admissible to support Defendants' argument(s).

Nevertheless, Plaintiff has demonstrated, with respect to the evidence produced by by Defendants in argument "A" of their summary judgment, that their are facts in dispute that create a genuine issue of material fact. A material fact that should be presented to a Jury. Therefore, Defendants have not met their burden of demonstrating that they are entitled to Judgment as a matter of law. For these reasons, Plaintiff asks that Defendants' request for summary judgment be denied.

## IV. Defendants Did Not Consider R.P. As A Sanction, Until After Plaintiff Filed Grievances.

Next, Defendants question the timing of events leading to the retaliatory actions taken against Plaintiff. Arguing that "Walker cannot prove his placement on Restricted Privileges Status was motivated by his decision to grieve water contamination issues, because the event which predicated his placement on Restricted ~~Pre~~ Privileges status occured before he started the grievance process related to water contamination." [Defs.' Mot. For Summary Judgment, p. 20].

To be more specific, Defendants are saying that Plaintiff's decision not to accept the Job offer in Food Services on August 16, 2013, happened well before Plaintiff's began the grievance process on August 26, 2013. And that this works to show that Defendants

motivation to place Plaintiff on R.P. was not a reaction to Plaintiff's decision to pursue his First Amendment right.

Defendants also purport that Plaintiff's refusal to sign the Job description for Food Services on August 16, 2013, was sufficient enough to justify placing Plaintiff on R.P. pursuant to A.R. 600-05. But, that Defendants "gave Walker two more opportunities to accept [an] assignment to Food Service before he was ultimately placed on Restricted Privileges status." [Id.].

Defendants are wrong. The event which lead to Plaintiff's placement on R.P. was his decision not to sign the Job description on 9/6/13. In fact, according to Exhibit 5, Plaintiff wasn't even told about R.P. as being a potential sanction, until 9/5/13. See Exhibit 5, p. 12, entry date 9/5/13.

This demonstrates that the sanction of being placed on R.P., wasn't even a consideration until after August 26, 2013; the date in which Plaintiff filed the grievance about water contamination. Furthermore, Defendants have acknowledge that they had no intention of placing Plaintiff on R.P. for his decision not to accept the Food Service position on August 16, 2013.

See [Def.'s Mot. For Summary Judgment, p. 20] (The act of refusing on August 16, 2013, was sufficient to refer and place Walker on Restricted Privilege status. However, the facility gave Walker two more opportunities to accept his assignment to Food Services before he was ultimately placed on Restricted Privileges status.).

What occured on August 16, 2013, was indeed, sufficient enough to place Plaintiff on R.P., however, Defendants consciously chose not to. Instead, Defendants gave Plaintiff an opportunity to find another Job. See Exhibit 4, p. 14, Lines 11-14 (When I left the interview of the Kitchan, it was explained to me that, if I did not have a Job the next time they called back, I would be assigned in the Kitchen.).

By the next interview, August 27, 2013, Plaintiff was assigned as an O.C.A. And because Plaintiff was already assigned, the interviewing officer, Correctional officer (c/o) Bredehoft,

released Plaintiff from the interview — no questions asked. Had Plaintiff done anything wrong during the interview, or had not been assigned when refusing the Food Service Job, C/o Bredehoft would have been required pursuant to SCF/CDoc policy to make a notation of the incident in Plaintiff's Chronlog (Exhibit 5). C/o Bredehoft made no such entry in Plaintiff's Chronlog. See Exhibit 5.

It was not until after Plaintiff had secured a Job as an O.C.A., and a week and a half after Plaintiff filed the grievance at issue, did the first threat of R.P. occur. See Exhibit 5, p. 12, entry date 9/5/13. And it was the events of 9/6/13, that lead to the decision to actually R.P. Plaintiff, See Exhibit 5, p.12, entry date 9/6/13 ( Inmate Walker refused to sign his Job discription for the second time. He was also asked to sign on 8/27/13. He will be [R.P.] Pending.).

So contrary to Defendants' contentions, the decision to place Plaintiff on R.P. came well after Plaintiff's filing of the grievance about the contaminated water. It should also be remembered that because Plaintiff was assigned as an O.C.A., he was not a viable candidate for placement on R.P.

Plaintiff has demonstrated that there are material facts in dispute that cause a genuine issue for trial. Therefore, Defendants have failed to meet their burden of demonstrating that they are entitled to Judgment as a matter of law. Plaintiff asks that Defendants' request for summary Judgment be denied.


IV. Defendants Have Motive To Retaliate

Next, in argument "C" of Defendants' Motion For Summary Judgment, Defendants allege that they have no motive to retaliate against Plaintiff. Defendants contend that the Executive Director (Exec. Dir.) of CDoc and Warden of SCF issued memos to the entire facility of SCF, which alerted all prisoners and staff members of the contaminated water. See [Def.'s Mot. For Summary Judgment, pp. 22-23].

Defendants go on to explain that because of these memos, " It makes no sense that CDOC would retaliate against Walker for grieving water contamination on the one hand, and specifically take ownership of the water contamination issue on the other hand. " [Def.'s Mot. For Summary Judgment, p.24].

Defendants have made this argument without knowing or understanding the facts surrounding the water contamination issue.

Simply put, the memos issued by the Exec. Dir. of CDOC and Warden of SCF, were issued to manipulate the SCF prison population into believing that their exposure to the contaminated water was for a brief moment of time; and that it did not pose a risk to the health of the SCF prison population. . . . The truth is, however, that the water had been contaminated since at least the year 1995. And, the possibility of contracting cancer and/or kidney toxicity, was were likely for those prisoners who had years of exposure to the contaminated water.

The memo issued by the Exec. Dir. of CDOC, provides that the SCF prison population was only exposed to the contaminated water for one day in February of 2013, and for a short amount of time in July of 2013. See Exhibit 14.

This is not true. The truth, is that the SCF prison population had been consuming the contaminated water for at least 15 years. See Exhibit 22, which shows that the water had been contaminated since from the year 1995 to 2010. And the memo issued by the Exec. Dir. of CDOC, Exhibit 14, shows that the water was still contaminated in August of 2013.

Therefore, the memo issued by the Exec. Dir. of CDOC was not done to "take ownership of the water contamination issue", [Def.'s Mot. For Summary Judgment, p. 24], but to deceive the SCF prison population into believing that their exposure to contaminated water, and health risks associated therewith, was far less severe than it truly was.

Exhibit 23 is one of the grievances Plaintiff filed concerning the contaminated water.

An examination of Exhibit 23 shows that one of the primary issues being grieved by Plaintiff, was the fact that SCF administration had hidden the truth about the contaminated water from the SCF prison population in the past.... And based on the new information given out in the memos, it was a real possibility that SCF administration was downplaying the seriousness of the situation. See Exhibit 23.

A look at Exhibit 23 also shows that the respondent of the grievance also downplayed the seriousness of the contamination issue, by telling Plaintiff that the contaminated water was not harmful.

So contrary to Defendants' contention, SCF not only had a motive to retaliate against Plaintiff for pursuing the contaminated water issue, but also had reason to want Plaintiff to stop digging into the matter.

This demonstrates that there is a material fact in dispute and a genuine issue for trial. For this reason, Defendants have failed to meet their burden of showing that they are entitled to judgment as a matter of law. Plaintiff requests that Defendants be denied summary judgment.

## VI. Defendants ARE Not Entitled To Qualified Immunity.

Lastly, Defendants argue that they are entitled to qualified immunity. However, qualified immunity only "protects governmental officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Weise v. Casper, 593 F.3d 1163, 1166 (10th Cir. 2010). "Once the defense [of qualified immunity] is asserted, the burden shifts to the Plaintiff to establish (1) that the Defendants' actions violated a federal constitutional or statutory right and (2) that the federal right was clearly established at the time of the challenged conduct. PJ ex rel. Jensen v. Wagner, 603 F.3d 1182, 1196 (10th Cir. 2010)". Brackeen v. Brown, 2013 U.S. Dist. LEXIS 11712, 27.

This Court has already determined that the right to be free from retaliation because of one's decision to engage in the First Amendment right of access, was clearly established at the time Plaintiff filed his complaint in this matter. See Walker v. Scherbarth, et al., 15-cv-00823-MJW (Doc. No. 31)(The only question, then, is whether Plaintiff's right to be free of retaliation for exercising his First Amendment rights was clearly established, in this context, by 2013, And there can be no doubt that it was.).

Therefore, Plaintiff is left with the burden of establishing whether or not Defendants' actions violate federal constitutional or statutory rights. Defendants, however, have already conceded to the first two ~~prongs~~ prongs of the three pronged standard needed to show retaliation in violation of Plaintiff's First Amendment right of access.

With that, Defendants have based all of their arguments on the third prong of the three pronged standard. That being the "but for" requirement.

Plaintiff contends that he has, in arguing this Response, established that there are material facts at dispute, that create a genuine issue for trial, as to each argument and fact presented by Defendants in their Motion For Summary Judgment. And because this Court has already ruled that retaliating against a prisoner for exercising his First Amendment rights violates a prisoners constitutional right and is a clearly established right; Plaintiff has carried his burden of demonstrating that Defendants are not entitled to qualified immunity.

Defendants are not entitled to qualified immunity. Therefore, Plaintiff asks that this Court deny their request for qualified immunity.


VII. Conclusion

Plaintiff concludes that the evidence, when viewed in the light most favorable to him, demonstrates that there is a material in dispute as to each fact presented by Defendants, and as to each fact, their is a genuine issue to be decided at trial.

Defendants have failed to meet their burden of showing that they are entitled to Judgment as a matter of law, and have as also failed to show an entitlement to qualified immunity. As so, Plaintiff requests that Defendants be denied Summary Judgment, as well as qualified immunity.

Date: May 11, 2016

Tyrone Walker #97763
Sterling Correctional Facility
P.O. Box 6000
Sterling, Colorado 80751

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-00823-MJW

TYRONE WALKER,
     Plaintiff,

V.

DAVID SCHERBORTH,
     Defendant

---

### DECLARATION OF L.R. MOORE

I, L.R. Moore, CDOC No. 47702, state, under penalty of perjury that around August, 2013, Tyrone Walker, CDOC No. 97763, was temporarily assigned to be my Offender Care Aide.

Subscribed this ___ day of March, 2016.

_____
L.R. Moore

EXHIBIT 16

DEPARTMENT OF CORRECTIONS
EMPLOYMENT/ACADEMIC/VOCATIONAL EVALUATION
FACILITY: STERLING

Inmate Name: WALKER, TYRONE                    DOCNO: 97763

Pgm Assignment:  UNASSIGNED UNASSIGNED               UNASSIGNED

Provider:  LONG, R    Date Assigned: 08/02/2013

Current Pay Rate: $   0.28    Report Dates: 08/02/2013  To  08/26/2013

Attitude Rating:  4 POOR

Aptitude Rating:  Not Entered

Status/Disposition:

Terminate(d) assignment on 08/26/2013 because of: TRANSFERRED FROM PROGRAM

Remarks/Comments:

EXHIBIT 17

CDOC/Walker-00123

DEPARTMENT OF CORRECTIONS
EMPLOYMENT/ACADEMIC/VOCATIONAL EVALUATION
FACILITY: STERLING

Inmate Name: WALKER, TYRONE                    DOCNO: 97763

Pgm Assignment:  FAC WK ASG N FOOD SV AM              CUSTODIAN

Provider: BREDEHOFT,    Date Assigned: 08/27/2013

Current Pay Rate: $    0.82    Report Dates: 08/27/2013  To  08/31/2013

Attitude Rating:  2 GOOD

Aptitude Rating:  2 ACCEPTABLE


Status/Disposition:

    Continue Assignment

Remarks/Comments:

EXHIBIT 18

CDOC/Walker-00124

```
              DEPARTMENT OF CORRECTIONS
       EMPLOYMENT/ACADEMIC/VOCATIONAL EVALUATION
              FACILITY: STERLING
```

Inmate Name: WALKER, TYRONE                    DOCNO: 97763

Pgm Assignment: FAC WK ASG N FOOD SV AM            CUSTODIAN

   Provider: CARAMIA, M     Date Assigned: 08/27/2013

Current Pay Rate: $   0.82   Report Dates: 09/01/2013  To  09/06/2013

Attitude Rating:  5 DISRUPTIVE

Aptitude Rating:  5 VERY POOR


Status/Disposition:

    Terminate(d) assignment on 09/06/2013 because of: POOR WORK PERFORMANCE

Remarks/Comments: TERMINATED FOR POOR WORK PERFORMANCE.  REFUSED TO SIGN JOB DESCRIPTION,
THEN REFUSED TO ANSWER THE PULL FOR HIS NEXT  WORK SHIFT.  CAPT.  CARAMIA

EXHIBIT 19

CDOC/Walker-00125

DEPARTMENT OF CORRECTIONS
EMPLOYMENT/ACADEMIC/VOCATIONAL EVALUATION
FACILITY: STERLING

Inmate Name: WALKER, TYRONE                    DOCNO: 97763

Pgm Assignment:  UNASSIGNED UNA PENDING              UNA PENDING

Provider:  NICKELS, F     Date Assigned: 09/07/2013

Current Pay Rate: $   0.28   Report Dates: 09/07/2013  To  09/12/2013

Attitude Rating:  4 POOR

Aptitude Rating:  Not Entered

Status/Disposition:

Terminate(d) assignment on 09/12/2013 because of: INTER-PROGRAM TRANSFER

Remarks/Comments: TERMINATED FROM ASSIGNMENT FOR REFUSING TO WORK HIS  WORK ASSIGNMENT. U
NA 90

EXHIBIT 20

CDOC/Walker-00126

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action Number: 15-cv-00823-MJW

TYRONE WALKER

      Plaintiff,

v.

DAVID SCHERBARTH, in individual and official capacities,
WESLEY WILSON, in individual and official capacities,
FRANKIE NICKELS, in individual and official capacities,
VIRGINIA PAGE, in individual and official capacities,
FELICIA BROOKS, in individual and official capacities,
JEAN PETERSON, in individual and official capacities,
RAMONA PHIPPS, in individual and official capacities,
BRIAN UHRICH, in individual and official capacities,
ALLEN HARMS, in individual and official capacities,
CURTIS DEINES, in individual and official capacities,
DIANA HILLYER, in individual and official capacities,
LISA FITZGERALD, in individual and official capacities,
RAYMOND HIGGINS, in individual and official capacities,
KEVIN VORWALD, in individual and official capacities, and
MARC BOLT, in individual and official capacities.

      Defendants.

---

## DEFENDANTS' AMENDED RESPONSE TO PLAINTIFF'S SECOND REQUEST FOR PRODUCTION OF DOCUMENTS

      Defendants, through their counsel, the Colorado Attorney General, hereby submit the following amended responses to Plaintiff's second request for production of documents.[1]

---

[1] The responses to production request 1 through 4 have been amended to reflect the correct bates label. The documents produced for this request remain the same.

EXHIBIT 21

## GENERAL OBJECTIONS/PRIVILEGE LOG

Defendants assert attorney-client privilege and/or work product with regard to any communications of any nature between them and their attorneys, including, but not limited to, correspondence, telephone conversations, memorandum, and any other communications or materials generated by counsel in the course of defending this action.

These interrogatories have been copied exactly as written by Plaintiff. Typographical and/or grammatical errors have not been corrected.

**REQUEST NO. 1:** Administrative Regulation (A.R.) 850-03, that was in use during August and September of 2013.

**RESPONSE: See Administrative Regulation 850-03 in effect August through September of 2013, bates labeled CDOC/Walker-00092 through CDOC/Walker-00112.**

**REQUEST NO. 2:** The Implementation Adjustment (I.A.) to A.R. 850-03, which was in use during August and September of 2013.

**RESPONSE: See Implementation Adjustment 850-03 in effect August through September of 2013, bates labeled CDOC/Walker-00113 through CDOC/Walker-00116.**

**REQUEST NO. 3:** The Chronological Log of Plaintiff's incidents and activities for the "entire" month of August of 2013. (That being from August 1, 2013, to August 31, 2013). For some reason, the Chronological Log provided by Defendants in their Initial Disclosure, only displays the second half of August, 2013.

**RESPONSE: See Plaintiff's chronology report from August 1, 2013 through August 31, 2013, bates labeled CDOC/Walker-00117.**

**REQUEST NO. 4:** A "certified" copy of Plaintiff's Account Statement for the dates of August 1, 2013, through to the date of November 1, 2013

**RESPONSE: See certified copy of Plaintiff's banking account statement from August 1, 2013 through November 1, 2013, bates labeled CDOC/Walker-00118 through CDOC/Walker-00121.**

2

CYNTHIA H. COFFMAN
Attorney General


s/ John A. VanLandschoot
JOHN A. VANLANDSCHOOT*
MOLLY A. MOATS*
Assistant Attorneys General
Corrections Unit
Civil Litigation & Employment Section
Attorneys for Defendants

1300 Broadway, 10th Floor
Denver, Colorado  80203
Telephone:  720-508-6623
FAX:  720-508-6032
E-Mail:  john.vanlandschoot@coag.gov
*Counsel of Record

3

| ADMINISTRATIVE REGULATION | REGULATION NUMBER | PAGE NUMBER |
|---|---|---|
| | 850-03 | 1 OF 12 |

| | CHAPTER: Offender Personnel |
|---|---|
| COLORADO DEPARTMENT OF CORRECTIONS | SUBJECT: Offender Assignment and Pay |

| RELATED STANDARDS: ACA Standards 2-CO-3C-01, 2-CO-5A-01, 4-4277, 4-4448 through 4-4450, 4-4452, 4-4457, 4-4458, and 4-4461 | EFFECTIVE DATE: April 15, 2011 |
|---|---|
| | SUPERSESSION: 02/01/11 |
| OPR: SCF | REVIEW MONTH: July | *Tom Clements* <br> Tom Clements <br> Executive Director |

## I. POLICY

It is the policy of the Department of Corrections (DOC) to provide an administrative process to achieve control and accountability in an equitable distribution of offender assignments and pay. Offenders are provided equal opportunities to participate in all institutional programs for which they are otherwise qualified. *Written policy, procedure, and practice prohibits discrimination based on an offender's race, religion, national origin, sex, disability, or political views in making administrative decisions and in providing access to programs. [4-4277] [2-CO-3C-01]*

## II. PURPOSE

The purpose of this administrative regulation (AR) is to establish the procedures by which offenders are referred to, hired and accommodated in, and terminated from assignments. This policy further outlines the facility/unit offender pay program, including the design of an annual offender pay plan, an outlined procedure for controlled expenditure of offender pay allocations, and guidelines for offender pay rates and offender assignments within each facility/unit.

## III. DEFINITIONS

A. ADA Inmate Coordinator (AIC): DOC employee within the Office of Legal Services who is responsible for ensuring that offenders with disabilities are provided reasonable accommodation, are not subjected to discrimination, or excluded from participation in or denied the benefits of DOC services, programs, and activities.

B. ADA Unassigned: An assignment status granted by the AIC, in consultation with the chief medical officer (CMO), or designee, to an offender who cannot be reasonably accommodated in any assignment.

C. Assignment Accommodation Form (AAF): The internal AIC form issued by the AIC or designee when an offender is granted an accommodation specific to an assignment. Completed AAFs are posted on DOCNET on the Legal Services – AIC page.

D. Cash-Funded Offender Work Assignments: Offender work assignments funded from Correctional Industries or Canteen operations, rather than from a general fund allocation.

E. Classification Committee: A committee within each respective facility chaired by the administrative head/designee, at or above the level of correctional officer III, which is responsible for all classification proceedings within the facility. The classification committee should include a case manager supervisor, the custody/control manager/designee, the intelligence officer, and the case manager for assignments that are security sensitive to the facility and public. In facilities where a classification committee is not feasible, a classification officer will, with the approval of the administrative head, act as the classification committee.

ATTACHMENT 1

CDOC/Walker-00092

| CHAPTER | SUBJECT | AR # | Page 2 |
|---|---|---|---|
| Offender Personnel | Offender Assignment and Pay | 850-03 | EFFECTIVE 04/15/11 |

F. <u>Eligible Offender</u>: ALL persons in the custody of the DOC, except those with temporary medical conditions, as determined by Clinical Services, offenders on RFP or punitive segregation status, or those coded as "ADA Unassigned" by the ADA inmate coordinator.

G. <u>Essential Functions</u>: As specified in the "offender assignment descriptions," those reoccurring functions or duties of an assignment, so closely related to the purpose of the assignment and of importance to the overall existence of the work unit, that they may not be removed, altered, or re-assigned without fundamentally changing the assignment.

H. <u>Incentive Pay</u>: Pay provided for work an offender completes above his assignment.

I. <u>Initial Mandatory Assignment</u>: Facility work assignment required as an initial placement of offenders for a minimum of 30 days.

J. <u>Intensive Labor Work Program (ILWP)</u>: A program made up of offenders who have been assigned to the reclamation of state property and other projects that would benefit governmental entities and non-profit organizations.

K. <u>Long Term Off-Grounds</u>: The status of any offender who is temporarily transferred from the facility where assigned by executive assignment order (EAO) and remains away from that facility or center in excess of 15 days. This includes, but is not limited to, court appearances, medical appointments, or removal from population to another facility or center without an EAO.

L. <u>Mandatory Program</u>: A specific treatment or behavior management program that includes specialized program plans to which offenders are expected to comply.

M. <u>Mandatory Programming Non-Compliance</u>: An offender is considered non-complaint when he/she refuses one or more of the following: programming or treatment as ordered by the court, pursuant to state statute, or as recommended by case management, medical, or mental health; or refusal of any assignment which is mandated by DOC policy. SOTMP non-compliance shall be identified with a "P" or "D" sub-code and drug and alcohol treatment with an "N" sub-code.

N. <u>Master Program Scheduling (MPS)</u>: A data system and method for evaluating offender assignment and program performance in order to provide data directly and accurately to the offender pay system.

O. <u>Master Program Scheduling (MPS) Facility Coordinator</u>: DOC and private prison employees designated at each facility/work unit to support and maintain MPS operations (not to include programming functions) for inmate pay.

P. <u>Offender Assignment Committee</u>: A committee appointed annually by the deputy director of Prisons, Clinical Services, comprised of one administrative head (chair), one facility case manager III, one facility MPS coordinator, and the ADA inmate coordinator or designee. This committee shall manage offender assignment descriptions, and review requests for modification of the descriptions.

Q. <u>Offender Assignment Description</u>: The document identifying a DOC offender labor/programming position, paid and unpaid, which contains the assignment title, eligibility requirements, essential functions, specific duties, and physical requirements.

R. <u>Offender Assignment Manual</u>: A compilation of DOC offender assignment descriptions employed/used at a particular facility, which shall be maintained and made available in the facility's general library for offender review.

S. <u>Offender Care Aide I, II, and III</u>: Offenders assigned to assist offenders with disabilities based on associated assignment descriptions.

CDOC/Walker-00093

| CHAPTER | SUBJECT | AR # | Page 3 |
|---|---|---|---|
| Offender Personnel | Offender Assignment and Pay | 850-03 | EFFECTIVE 04/15/11 |

T.  <u>Offender Pay Committee</u>: DOC employees assigned by the directors of Prisons and Finance and Administration to oversee offender pay allocations, policies, and procedures. Members of this committee shall include an administrative head, a business manager, and Budget Office, Inmate Bank, Prison Operations, and Correctional Industries employees.

U.  <u>Offender Supervisor</u>: DOC employee, contract worker, or volunteer who supervises offenders in their respective assignments, including labor supervisors and voluntary and mandatory program instructors/facilitators.

V.  <u>Otherwise Qualified</u>: Applies to an offender with a disability who, with or without reasonable accommodation, meets the essential eligibility requirements for the receipt of services or participation in programs or activities provided by DOC. The offender must be able to perform the essential assignment functions for which the offender holds or desires, in addition to meeting the DOC assignment qualifications and/or requirements to be considered otherwise qualified.

W.  <u>Production Incentive Bonus</u>: Correctional Industries bonus pay over and above base pay that may be determined by specific cost center performance/productivity criteria.

X.  <u>Reasonable Accommodation</u>: Any structural or procedural modification or adjustment to rules, policies, or practices; the removal of architectural, communication, or transportation barriers; or provision for auxiliary aids, equipment, or services, to ensure qualified offenders with disabilities have equal access to DOC services, programs, and activities.

Y.  <u>Unpaid Category</u>: Offenders in this category are assigned to out to court (OTC) or a hospital.


IV.  <u>PROCEDURES</u>

A.  <u>Offender Assignments</u>

1.  ***The DOC requires all eligible offenders to work unless assigned to an approved education or training program. Offenders have the option of refusing to participate in any rehabilitation or treatment program except adult basic education and programs required by statute or ordered by the sentencing court or paroling authority. [4-4449]***

2.  ***The DOC provides opportunities for offender employment in correctional industries, facility maintenance, operations, public works, or community projects. [4-4452]*** The DOC shall provide a variety of work choices relevant to the current job market, both inside and outside of the facility in the listed areas, and to the extent possible in public works and community projects, in accordance with the offender's classification and custody needs.

3.  ***All facilities will maintain a comprehensive written plan for full-time work and/or program assignment for all eligible offenders in the general population. [4-4448] [2-CO-5A-01]***

4.  ***The offender work plan provides for employment for offenders with disabilities. [4-4450]*** Offenders with disabilities may request and will be provided reasonable accommodation to ensure equal access to assignments for which they are otherwise qualified, to include unpaid voluntary programming. For more information regarding requesting accommodations, refer to section IV.C. of this AR and AR 750-04, *Americans with Disabilities Act-Offender Request for Accommodations*

5.  Offenders may be subject to a restricted privileges status review (in accordance with AR 600-05, *Restriction of Offenders' Privileges in Correctional Facilities*) if they refuse to participate in programs designated by the classification committee.

| CHAPTER | SUBJECT | AR # | Page 4 |
|---|---|---|---|
| Offender Personnel | Offender Assignment and Pay | 850-03 | EFFECTIVE 04/15/11 |

6. Every offender assignment description will have a title and minimum eligibility requirements, provide the essential functions, specific duties, and disclosure of the physical requirements associated with the assignment. Electronic versions of the approved offender assignment descriptions are located on the DOC shared drive. The most recent revision date is documented on each assignment description.

   a. Facility administration, program, and industry supervisors with a justified need to abolish, create new, or revise offender assignment descriptions shall submit a "Request for Assignment Description Modification" (Attachment "F") and if necessary, an "Offender Assignment Description" (Attachment "E") with suggested language, to the Offender Assignment Committee for consideration. For requests involving an adjustment in pay allocation, such as a new or abolished assignment description, the Offender Assignment Committee shall coordinate with the Offender Pay Committee by forwarding a copy of the request to that committee for consideration.

   b. The MPS programs for approved new assignments will be built by the committee MPS coordinator. There will be no global access to MPS at the facility level.

   c. The facility administrative head shall designate a position to be responsible for ensuring that the offender assignment manual is available in the general library for offender review and is updated, as necessary. The offender assignment manual will contain available assignments at that particular facility only. If the facility requires initial mandatory assignments, such as food service or labor crew, this information shall be included in the offender assignment manual.

   d. The MPS Quota Report shall be maintained with the offender assignment manual in the general library and also posted in common areas, as defined by facility policy. This report will contain current information about offender assignment vacancies and shall be updated on a weekly basis.

   e. Copies of the "Offender Assignment Request" (Attachment "B") shall be made available to offenders in the facility general library upon request.

7. Offenders assigned to mental health, sex offender, drug and alcohol, or other facility mandated treatment programs will be paid for the time spent attending such programs by the area/department to which they are assigned. Offenders will be paid at the assigned rate for their normal assignment and will not be docked for hours spent in such approved programs.

B. Case Manager Referral and Assignment Process

   1. Within 14 business days of arrival at a permanent facility, case managers shall review the offender's working file and discuss with the offender any programmatic and diagnostic needs to ensure timely and appropriate placement into an assignment.

   2. After completion of any initial mandatory assignment, offenders are required to request assignments by reviewing the MPS Quota Report and Offender Assignment Manual in the general library. Offenders shall then complete and submit at least one, but not more than three, "Offender Assignment Request" forms (Attachment "B") for open assignments for which they may be eligible, to their case manager. Upon receipt of the request, case managers shall meet with the offender to review and discuss eligibility requirements.

   3. By policy, offenders are required to maintain assignment and are therefore required to take the initiative to request a new assignment upon completion of initial assignment or are otherwise released, terminated, or transferred; however, it is the case manager's responsibility to remain apprised of offenders on his/her caseload who do not take this initiative and remain unassigned. Case managers shall make efforts to assign offenders, as appropriate.

| CHAPTER | SUBJECT | AR # | Page 5 |
|---|---|---|---|
| Offender Personnel | Offender Assignment and Pay | 850-03 | EFFECTIVE 04/15/11 |

4. If an offender approaches a case manager or supervisor directly expressing an interest in assignment to the program or job, the offender shall be referred to the general library to review the MPS Quota Report to determine whether an opening is available. At no time shall a supervisor offer an offender a position prior to referral, pre-select a specific offender for an assignment that has not been posted and routed through classification committee, or otherwise assign an offender outside of this procedure.

5. An offender's medical restrictions, as directed by Clinical Services, may impact his/her eligibility for certain assignments. The offender shall address any restrictions and physical requirements of an assignment with Clinical Services prior to making an assignment request to their case manager.

6. Case Manager Responsibilities Prior to Referral to Classification Committee:

   a. The case manager shall review the offender's working file to ensure that the offender meets the minimum eligibility requirements, i.e., determined to be otherwise qualified, for the assignment requested.

   b. Case managers shall verify that the offender has the required training and/or certification for the requested assignment (e.g., food handler, janitorial, or other vocational certificates, high school/GED diploma, etc.) and that any pre-referral testing has been completed, as indicated under the assignment description eligibility requirements.

   c. If an offender appears to meet the assignment eligibility requirements, case managers shall proceed with completion of the "Offender Assignment Assessment Form" (Attachment "C").

      1) If the assignment eligibility criteria is not clear or the offender requires pre-referral testing, case managers shall consult with the supervisor of the assignment for which the offender is potentially being referred to in order to ensure that the offender does in fact meet the requirements or to arrange for the testing.

      2) During discussions to collect information about the assignment and/or specific eligibility requirements, the case manager shall not disclose to the supervisor any identifying information about the offender requesting the assignment, his/her disability status, limitations, or medical conditions.

   d. The case manager shall then forward the "Offender Assignment Request" (Attachment "B") and the "Offender Assignment Assessment Form" (Attachment "C") and to the classification committee for review.

7. In those instances where minimum eligibility requirements *are not* met and the offender is not otherwise qualified for the assignment, the case manager *shall not* complete the "Offender Assignment Assessment Form" (Attachment "C"), but shall document the contact and review by utilizing MPS Code 13, "Eligibility Review," through entering the appropriate denial code and notes into the MPS system. The "Offender Assignment Request" (Attachment "B") shall be added to the offender's working file.

8. The classification committee shall meet on a regular basis to review all case manager assignment referrals to ensure form completion and accuracy of assessment, in order to make the final assignment determinations in consideration of facility operational needs and security concerns.

   a) *The Classification committee shall provide the security and program determinations necessary for any individual to be eligible for Correctional Industries work. [4-4457]*

   b) If the classification committee receives more than one eligible referral for one open assignment, the committee shall coordinate with the supervisor of that assignment and his/her department head to determine what action will be taken to determine the most qualified candidate. Options for selection include:

| CHAPTER | SUBJECT | AR # | Page 6 |
|---|---|---|---|
| Offender Personnel | Offender Assignment and Pay | 850-03 | EFFECTIVE 04/15/11 |

       1)   Supervisor shall perform offender interviews;

       2)   A skills test shall be administered; or

       3)   A waitlist established based upon an unbiased and consistent criteria and order (i.e. in order of most time served on the current sentence).

    c)   The results of the above methods and/or justification from the supervisor shall be provided to the classification committee for consideration and final approval of assignment.

9.   If an open assignment has been posted at the facility for no less than seven business days and the classification committee has received no referrals, or no otherwise qualified candidates exist due to eligibility factors or a specialized skill set that no offender at that facility holds, or based on other legitimate operational needs, the classification committee shall coordinate with other facility classification committees and Offender Services in an effort to locate eligible offender(s) for assignment consideration and facility transfer.

10.  When additions are made to a supervisor's assignment roster, the supervisor shall print the applicable assignment description located on the DOC shared drive and meet with the offender to review and sign the assignment description.

11.  If the offender *is not* requesting disability accommodations, the supervisor shall direct the offender to mark the appropriate box at the bottom of the assignment description and may begin the assignment immediately. If the offender indicates or marks he/she *does require* a disability accommodation, or in the case of an ADA alert, refer to Section IV.C.

12.  The supervisor shall retain the signed assignment description until offender's completion, release, or termination from the assignment, and shall forward a copy to the classification committee.

13.  The classification committee shall review the assignment description to ensure it is properly completed then immediately forward it to the offender's case manager as notification of completion of the process. Case managers may purge the copy.

C.  ADA Alert/Assignment Accommodations

1.   Prior to meeting with the offender as indicated in IV.B.10., the supervisor shall review or otherwise be notified of the offender's ADA alert status on DCIS. If an ADA alert is present, the supervisor shall proceed to asking the offender is he/she requires an accommodation:

    a.   If the offender states he/she **can perform** the essential functions of the assignment without an accommodation, the supervisor shall contact the AIC or appropriate designee, via e-mail, with 1) the offender's name and DOC number; 2) the assignment description being signed; and 3) indicate that offender is **not** requesting accommodation for the assignment.

       The offender may begin the assignment immediately after signing the assignment description and checking the box indicating "no accommodations." The AIC or designee will not complete an AAF for any ADA offender who **does not** request accommodations.

    b.   If the offender states he/she **cannot perform** the essential functions of the assignment without an accommodation, the supervisor shall contact the AIC or appropriate designee to engage in the interactive accommodation process with the offender via telephone conference. If a reasonable accommodation can be provided, the AIC or designee will then complete an AAF and email it to the supervisor for signatures. The

| CHAPTER | SUBJECT | AR # | Page 7 |
|---|---|---|---|
| Offender Personnel | Offender Assignment and Pay | 850-03 | EFFECTIVE 04/15/11 |

supervisor shall print the AAF to be signed by the supervisor and the offender on the designated signature lines. The supervisor shall make a copy of the AAF for his/her records and will immediately forward the original to the person designated by the classification committee who is responsible for collection, scanning, and return of the signed AAFs to the appropriate AIC or designee. This person must ensure that the scanned document is clear and saved in proper format, prior to emailing and purging of the original. Upon receipt of the AAF, the AIC shall post it to DOCNET on the Legal Services –AIC page.

c.  Regardless if an offender is granted an accommodation specific to the assignment, the supervisor is responsible to review the offender's accommodation resolution, which is available on DOCNET on the Legal Services-AIC page, as the offender *is* authorized to have the listed accommodations/devices at the job site/program area (e.g., medically necessary shoes, access to diabetic finger sticks upon request, etc.).

d.  The assignment description form process described in Section IV.B. still applies and shall be followed when the ADA alert is present. The AIC **does not** require a copy of the assignment description.

2.  Under no circumstances shall an accommodation be granted, nor shall a supervisor be required to implement an accommodation that fundamentally alters the purpose or nature of the program, significantly frustrates or decreases industry or facility operational productivity, or creates an imminent threat to safety or security. The supervisor should immediately report these concerns to the AIC or designee, prior to signing the assignment description. In the case of a matter arising after assignment, the supervisor shall direct the offender not to report to the assignment, without penalty, until further notice.

3.  If the offender refuses to cooperate in the interactive accommodation process, he/she is effectively refusing to work and may be subject to disciplinary action.

4.  Offenders with an active AAF may request changes or additions to their assignment accommodations by submitting an "Offender Request for Accommodation" (AR 750-04, *Americans with Disabilities Act-Offender Request for Accommodation*, Attachment "A") to the AIC or contacting their supervisor directly. If the offender contacts the supervisor, the interactive accommodation process in Section IV.C.1.b. shall apply. Any assignment accommodation changes or additions must be made in consultation with the AIC.

5.  When a reasonable accommodation is not available, the AAF will not be completed for the assignment and the AIC or designee shall direct the supervisor to refer the offender back to the classification committee for consideration to a different assignment (See "Offender Assignment Process Flowchart" Attachment "A").

6.  In most cases, supervisors are **not** required to contact the AIC when the offender **does not** have an ADA alert status; however, if the offender is requesting an assignment accommodation or is identified as having an obvious functional limitation that is affecting his/her ability to perform essential functions, he/she **may** be entitled to reasonable accommodations. In this case, the supervisor shall consult the AIC or designee.

7.  Offenders shall be considered for "ADA Unassigned" status when:

a.  The offender has been referred back to the classification committee and efforts have been made to accommodate the offender in various assignments, and no reasonable accommodations are available; or

b.  The offender's limitation is so severe that it would be unsafe or against medical orders for the offender to participate in any assignment that he/she may be eligible or otherwise qualified for.

In either case, such determination shall be made on a case-by-case basis after consultation between the AIC and the CMO, or designees.

c.  If the offender's condition improves or other assignments and/or accommodations become available, the offender's "ADA Unassigned" status may be reevaluated.

| CHAPTER | SUBJECT | AR # | Page 8 |
|---|---|---|---|
| Offender Personnel | Offender Assignment and Pay | 850-03 | EFFECTIVE 04/15/11 |

D. ***The DOC shall require that offenders are compensated for work performed. [4-4461]*** The administrative head, or designee, shall design an annual pay plan for disbursement of the offender pay allocation for each facility/unit that includes number of offender assignments in each pay grade; designation of part-time offender assignments; and quotas for individual assignments.

1. ***Designations and appropriations for additional incentives such as monetary compensation, special housing, extra privileges, and good time credits should be distributed according to written guidelines developed by the facilities. [4-4461]***

   a. Earned time will be granted in accordance with AR 550-12, *Earned Time*.

   b. An offender may be paid incentive pay with written approval of the administrative head, on a short term basis, as an incentive for extra work performed. Incentive pay must be paid through the normal appropriation for offender pay and will not be considered a valid reason for over-expenditure by a facility or work unit.

   c. An incentive charge of $1.00 for every $25.00 will be assessed on each work order initiated through the Career and Technical Education Program. The instructor of the individual program will designate on the work order the specific amount of the incentive fee to be paid to each offender and the appropriate business office will credit that amount to the offenders' accounts.

2. Facility/unit MPS assignment quotas will be adjusted to mirror the annual pay plan by the MPS facility coordinator.

3. Assignments may be designated as half-time; however, offenders will not receive pay for more than the equivalent of one full-time assignment.

4. Correctional Industries/Canteen will develop and implement a separate offender pay plan, utilizing standard offender pay grades for cash funded offender assignments. In addition, Correctional Industries/Canteen operations may develop offender pay plans that include minimum wage or prevailing wage and production incentive bonuses, as approved by the executive director and associate director of Correctional Industries. ***The number of offenders assigned to Correctional Industries operations will meet the realistic workload needs of the industries operating unit. [4-4458]***

5. Quarterly reviews of the offender pay plan will be conducted at the facility/unit level to monitor expenditures versus allocations. Adjustments may be made at any time to move offender assignments as operational or fiscal necessity dictates.

E. <u>Annual Offender Pay Allocations</u>: Factors considered for annual offender pay allocations include the number of offender workers, ILWP, students, mandatory program assignments, Correctional Industries/Canteen workers, unpaid workers, unassigned, unpaid program assignments, and unpaid non-workers.

1. Annual requests submitted for allocation adjustments from the administrative head to the Offender Pay Committee are compared to previous appropriations, allocations made to each facility/unit, and the facility/unit information reported in quarterly reports.

2. If a facility overspends its inmate pay allocation, the following year's allocation may be reduced by that amount. Extenuating circumstances may allow for relief from this restriction.

3. Allocation adjustments are evaluated by the Inmate Pay Committee, which meets throughout the year.

4. Provisions will not be made for emergency work issues outside regular assignment hours.

5. Offender pay rates may be frozen or grade rates changed, in accordance with budgetary constraints.

| CHAPTER | SUBJECT | AR # | Page 9 |
|---|---|---|---|
| Offender Personnel | Offender Assignment and Pay | 850-03 | EFFECTIVE 04/15/11 |

F.  Assignment/Termination

  1.  Offender assignments are not effective until reported and indicated in MPS. Offenders shall not participate in an assignment until approved in MPS and an assignment description is signed. Each assigned offender shall receive in an accessible format and sign an assignment orientation, to include applicable safety and operational rules.

  2.  Offenders may be recommended for termination from an assignment for just cause (e.g., poor work performance, failure to report to assignment, disciplinary convictions, violation of assignments, posted operational rules, or any other suitable code listed in MPS). Prior to termination for cause, the supervisor must contact the AIC to discuss grounds for termination for any offenders with an active "Assignment Accommodation Form." Supervisors will make note of such conversation in the MPS program. An offender who leaves an assignment for any reason (e.g., facility transfer, poor work performance, poor behavior) will be terminated in MPS immediately.

    a.  Offenders may not be terminated within the first 30 days of any new assignment without prior approval of the classification committee.

    b.  Offenders placed on removal from population (RFP) status will receive pay at Grade 1 while they are not at their assignment. If there aren't further proceedings, disciplinary convictions, or termination by the supervisor, the offender will be returned to his/her assignment, if possible, or a comparable assignment.

    c.  Offenders who are out to court, on RFP status, or in a DOC infirmary may be terminated at the discretion of the supervisor after five working days of the change in the offender's status.

  3.  An offender who transfers to another facility/unit, for any reason, does not retain the right to any previous assignment.

  4.  If an offender is terminated due to pending COPD charges or a COPD conviction, but is ultimately found not guilty or the conviction is overturned on appeal on a factual basis, but not on procedural error alone:

    a.  The offender shall be placed in the same or similar assignment at the same pay grade as was previously held, so long as the offender is still otherwise qualified and if availability permits. If an equivalent assignment is not available, the offender will be referred to the MPS Quota Report in the facility general library.

    b.  If a gate pass or similar clearance was required for the assignment, it shall be reinstated if the offender can be placed back into the same or similar assignment.

    c.  The offender may receive up to a maximum of 45 days back pay.

G.  Attendance

  1.  Assignment attendance will be entered into MPS by the supervisor.
  2.  Offenders will be paid monthly for the actual number of days worked, which will not exceed 23 days per month.

H.  Evaluation

  1.  Work Aptitude Assessment Ratings Per DCIS are as Follows:

    a.  Outstanding.
    b.  Above Standard.
    c.  Satisfactory.
    d.  Needs Improvement.
    e.  Unsatisfactory.

CDOC/Walker-00100

| CHAPTER | SUBJECT | AR # | Page 10 |
|---|---|---|---|
| Offender Personnel | Offender Assignment and Pay | 850-03 | EFFECTIVE 04/15/11 |

    2.   <u>Attitude Assessment Ratings Per DCIS Utilize the Following Criteria</u>:

        a.   High.
        b.   Good.
        c.   Fair.
        d.   Poor.
        e.   Disruptive.

    3.   Performance notes in MPS will be made each month during the offender evaluation by the supervisor.

    4.   Supervisors will communicate the results of the offender's monthly evaluation to the offender.

I.   <u>Payroll</u>

    1.   The offender pay period is from the first to the last day of the calendar month. Private prisons may establish a different offender pay period.

    2.   Supervisors will electronically transmit payroll in MPS and generate the wage pay sheets by the third business day of each month utilizing the following criteria:

        a.   <u>Full Day Paid Attendance</u>: Offender was actively participating in assignment for scheduled shifts.

        b.   <u>Excused Absence, Grade 1</u>: Offender was unable to participate in assignment due to supervisor absence (holiday, vacation, sick, meeting, etc.), segregation status, facility appointment (medical, dental, etc.), facility lockdown/shakedown, or lay-ins.

        c.   <u>Excused Absence, No Pay</u>: Offender was unable to participate in assignment due to out-to-court status, admittance to hospital, medical day trip, off-grounds' status, or long term off-grounds.

        d.   <u>Unexcused Absence, No Pay</u>: Offender did not report to assignment, offender walked away, or was removed from the assignment.

        e.   Half day attendance/pay will utilize the criteria above.

        f.   Offenders who meet the definition of "unpaid" are not assigned to a pay grade and are not paid.

    3.   Signed payroll sheets will be forwarded to the department manager/designee for approval.

    4.   Upon signed approval by the department manager/designee, the signed payroll sheets will be submitted to the MPS facility coordinator/designee.

    5.   Completed offender payroll will be submitted to Inmate Banking on a scheduled, monthly basis, no later than the fifth business day after the end of the pay period, in order to be posted to offender accounts by the seventh business day after the end of the pay period.

    6.   Unassigned payroll is entered in MPS by the assigned case manager/designee.

    7.   Offenders who are non-compliant with mandatory programs will not receive production incentive bonus pay from Correctional Industries. Offenders are considered non-compliant if they have a sex offender code designation of "P" or "D."

| CHAPTER | SUBJECT | AR # | Page 11 |
|---------|---------|------|---------|
| Offender Personnel | Offender Assignment and Pay | 850-03 | EFFECTIVE 04/15/11 |

8. Offender pay corrections will be documented on the "Offender Pay Correction Sheet" (Attachment "D"). After approval is obtained from the department manager/designee, the form will be faxed to Inmate Banking within a reasonable time frame, usually by the second business day after final approval.

Overpayments to offenders will be corrected the following month, via the normal inmate pay process.

J. Offender Pay Grades

1. Offender assignments will be placed into only one of the following pay grades, based on offender attendance:

a. Grade 1: $0.23 full day: Unassigned

b. Grade 2: $0.30 half day: Assigned (or mandatory half-time program)

c. Grade 3: $.60 full day: Assigned (or mandatory full-time program)

d. Grade 4: $0.80 full day: Offender Care Aide I

e. Grade 5: $1.20 full day: Offender Care Aide II

f. Grade 6: $2.00 full day: Offender Care Aide III

g. Correctional Industries: Correctional Industries/Canteen operations may develop offender pay plans that include minimum wage or prevailing wage and production incentive bonuses, as approved by the DOC executive director and associate director of Correctional Industries.

h. Incentive Pay: With written approval of the administrative head; not to exceed an additional $0.10 per day for no more than 15 days, per six month period. Incentive pay will be designated on the "Offender Pay Correction Sheet" (AR Form 850-03D) and submitted per Section IV.I.8.

2. Intensive Labor Work Program, lay-in, holiday, and supervisor vacation will be paid at Grade 1.

3. Assigned offenders will be paid monthly at a designated daily rate for the actual number of days worked, not to exceed 23 days per month.

4. Offenders coded as "ADA Unassigned" will be paid at Grade 1, $.23 cents per day, but shall not be penalized with respect to earned time or placement issues. "ADA Unassigned" offenders shall be provided the benefits allowed non-disabled offenders, including but not limited to, yard time and other activities. This classification will not entitle offenders to any specific privileges for which they are not otherwise entitled.

5. Offenders temporarily assigned to another facility (including an infirmary) are paid at the unassigned rate by their permanent facility.

V. RESPONSIBILITY

A. The administrative head is responsible to remain within the facility allocation for inmate pay, design and implement an offender pay plan that does not exceed the annual allocation, and monitor the disbursement of funds on a quarterly basis.

B. Each facility or unit is responsible to maintain a current "Offender Assignment Manual" listing all standardized assignments specific to the facility or unit.

CDOC/Walker-00102

| CHAPTER | SUBJECT | AR # | Page 12 |
|---|---|---|---|
| Offender Personnel | Offender Assignment and Pay | 850-03 | EFFECTIVE 04/15/11 |

C. Each facility or unit is responsible to offer assignments to as many offenders as possible, within its inmate pay allocation.

D. The associate director of Correctional Industries and Canteen operations will notify the affected facility or unit of impending pay plan alternatives.

E. The Offender Assignment Committee is responsible to maintain current offender assignment descriptions, to maintain them on the DOC shared drive, and to approve any changes or additions to the approved assignment descriptions.

VI. AUTHORITY

  A. Long Appropriations Bill.
  B. CRS 17-20-117. Labor of inmates.
  C. CRS 17-29-103. Executive director to establish work program.
  D. CRS Title 17, Article 32 - Correctional Education Program Act of 1990.
  E. Americans with Disabilities Act (ADA) of 1990, as amended. 42 U.S.C.S. 12101 et seq. (LexisNexis 2010).
  F. 28 C.F.R. § 35 et seq. (LexisNexis 2010).
  G. ADA Litigation Remedial Plan.

VII. HISTORY

  December 15, 2009
  April 20, 2009
  November 15, 2008
  November 15, 2007
  November 15, 2006
  November 15, 2005
  October 15, 2005
  October 15, 2004

ATTACHMENTS:  A. AR Form 850-03A, Offender Assignment Process Flowchart
  B. AR Form 850-03B, Offender Assignment Request
  C. AR Form 850-03C, Offender Assignment Assessment Form
  D. AR Form 850-03D, Offender Pay Correction Sheet
  E. AR Form 850-03E, Offender Assignment Description
  F. AR Form 850-03F, Request for Assignment Description Modification
  G. AR Form 100-01A, Administrative Regulation Implementation/Adjustments

CDOC/Walker-00103



**TECHNICAL MEMORANDUM**
Mr. John Gillogley, Colorado Department of Corrections
March 15, 2011
Page 3 of 9

### 3)    WATER QUALITY

Uranium is a common naturally occurring radioactive substance that is present in mineral form in geological strata and groundwater sources. It enters groundwater through the decay and dissolution of the geological strata. Water Quality data from the City of Sterling and the SCF from 1995 through 2010 has indicated that uranium is present in concentrations above the MCL of 30 µg/L. Water quality data is provided in Appendix B. Statistical analysis of the water quality data yielded an average uranium concentration of 32 µg/L and a standard deviation from the mean of 10 µg/L. Based on this statistical analysis, a design concentration of 42 µg/L (one standard deviation above the mean) was established for this evaluation. A graphical representation of the water quality data statistical analysis is provided in Figure 1. The treatment process based on this design concentration will have the capacity to treat the greater percentage of uranium concentrations and limit the impact of periodic spikes in uranium observed in the water quality data. Design parameters including uranium concentration are summarized in Table 2.

**TABLE 2 – DESIGN PARAMETERS**

| DESIGN PARAMETER | VALUE |
|---|---|
| SCF Design Flow Rate | 450,000 gpd |
| Uranium Concentration | 42 µg/L |

### 4)    GENERAL SYSTEM DESCRIPTION

The existing potable water system at the SCF consists of a water softening system, two 500,000 gallon water storage tanks, three booster pumps downstream of the storage tanks, and associated valves and distribution piping. Upstream of the water softening system, a 3 inch irrigation line branches off the primary facility piping. The storage tanks were originally sized to provide a required fire storage volume of 750,000 gallons (SCF Executive Summary, Section 2.3, Smith Report). Downstream of the tanks there is a dedicated fire pump that is housed in the same building as the softening system and booster pumps. Water system piping is configured to allow manual bypass of the softening system if required. The general layout and orientation of the treatment building and process piping and pumps is provided in Figure 2.

Richard P. Arber Associates, a Division of Hatch Mott MacDonald
198 Union Boulevard, Suite 200, Lakewood, CO 80228 T • 303-831-4700 • F 303-831-0290
www.hatchmott.com
T:\Projects—Clients\CDOC\CCLDOC04 - Stat'g Cottrel/unal Facility\1-PreDesign\Reports\WRF Options\WRF Tech Memo_rev_03 11 11.docx

DRAFT FINAL

EXHIBIT 22

CDOC/WALKER-00125

DC Form 850-04B (12/13/12)

OCT 18 2013

– *medical* –
## Colorado Department of Corrections Offender Grievance Form

| Offender Must Complete | |
|---|---|
| Name: Tyrone Walker | Doc #: 97763 |
| Grievance number (complete for Steps 2 and 3, only): ~~C-SF13/14-00045488-1~~ C-SF13/14-00045488-1 | |

**Instructions:**
1. Fill out identifying data in space provided. (Must be legible.)
2. Clearly state basis for grievance or grievance appeal.
3. State specifically what remedy you are requesting.
4. Remedy must remain consistent.

**Subject of Grievance and Requested Meaningful Remedy:** Five, almost six years ago, a report was issued by what I believed was the Colorado Department of Public Health and Environment (CDPHE), concerning the drinking water in the city of Sterling. The report stated that the water contained cancer causing contaminants immediately after this report, the then Associate Warden Chapdelaine, put out a statement that was delivered to the inmate population via the SCF teleprompter system. Chapdelaine's statement basically said that the drinking water, although contaminated, was only hazardous if consumed/exposed to, over long periods of time; that there was nothing to worry about, because SCF was getting a new water filtration system. At one point, prisoners were told that SCF's water was from a different source than that of the city of Sterling. Months later, inmates were told that the water was no longer contaminated and was safe to drink. On 9/22/13, SCF announced again, that the drinking water contains cancer causing contaminants. This leads me to believe that water has always been contaminated; that the powers to be has known this the entire time and lied about it being safe to drink in order to conceal the true truth. I believe that I have consumed and/or been exposed to this contaminated water for over five years. As RELIEF: I am need to know exactly what cancer causing and/or hazardous materials are in the water; what ailments and/or sicknesses I've been exposed to or could possibly contract; how long the drinking water has been contaminated (for this I will need the CDPHE* reports for the years of 2005 - 2013); and I need to be tested annually, for whatever ailments/sicknesses I could develop from years of consuming and being exposed to this contaminated water.

| Date: ~~Oct~~ 10/9/13 | Offender Signature: Tyrone Walker | |
|---|---|---|
| Case Manager/CPO Must Complete | Facility/Unit/Pod/Parole Office/Community Corrections Center: SCF | Step (Circle one) 1 ②  3 |

| Signature: Allen Harris | |
|---|---|
| Print Name and DOC Employee Id #: Allen Harris   6343 | Date received: 10/10/13 |

Attachment "B"
Page 1 of 1

RECEIVED OCT 2 3 2013

---

### TO BE COMPLETED BY GRIEVANCE COORDINATOR
RECEIPT: I acknowledge receipt this date of a complaint from the offender in regards to the following subject.
Date 10/23/2013        Grievance Coordinator & ID #   WILSON, NICOLE (8219)

### RESPONSE
Mr. Walker ~ The amount of uranium in the Sterling water is not considered to be toxic or harmful. However, it was determined by your administration that an alternative drinking source would provide the offender population with an option to discontinue ingesting local water. You have previously been provided with educational materials related to uranium in drinking water and any potential health hazards that may exist. If you wish, you may submit a kite to be seen by a provider to discuss any questions you may have related to this issue. You may request records through CDPHE, if you wish to do so; however, we will not provide such records for the listed time frames. Any testing that you are requesting will need to be ordered by a medical provider. Grievance partially granted.

### TO BE COMPLETED BY RESPONDER
Date 10/23/2013        Responder Name & ID #  SOUCIE, JAMIE (12620)        Response Date   11/05/2013
**Disposition**                        **Granted in part**

### TO BE COMPLETED BY OFFENDER
RECEIPT: I acknowledge receipt this date of a response from the Department of Corrections, to this grievance.
If you are dissatisfied with the response to this grievance, you may obtain further review by submitting the next step to the appropriate individual.

Offender Name  WALKER, TYRONE                DOCNO 97763      Grievance # C-SF13/14-00045488-2
Date: 11/14/16        Offender Signature: Tyrone Walker

Original: Department file/AIC                                Copies: Administrative Head, Offender

EXHIBIT 23



<u>CERTIFICATE OF SERVICE</u>

I, Tyrone Walker, hereby certify that a true and correct copy of Plaintiff's Response To Defendants' Motion For Summary Judgment, was placed in the mail, postage pre-paid, and addressed to the following:

Office of the Clerk
U.S. District Court, District of Colorado
901 19th Street, Room A105
Denver, Colorado 80294-3589


John A. Vanlandschoot
Assistant Attorney General
1300 Broadway, 10th Floor
Denver, Colorado 80203



Date: <u>May 11, 2016</u>


Tyrone Walker # 97763
Sterling Correctional Facility
P.o. Box 6000
Sterling, Colorado 80751